*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A16-0140**

United Islamic Society,
Respondent,

vs.

Masjed Abubakr Al-Seddiq, Inc., et al.,
Appellants,

and

In the Matter of the: Putative Charitable Trust
for the Benefit of the Rochester Muslim Community

**Filed August 29, 2016
Affirmed
Smith, Tracy M., Judge**

Olmsted County District Court
File Nos. 55-CV-13-4401, 55-CV-13-6190

Grant M. Borgen, Jeremy R. Stevens, Bird, Jacobsen & Stevens, P.C., Rochester, Minnesota (for respondent)

Daniel J. Heuel, O'Brien & Wolf, L.L.P., Rochester, Minnesota (for appellants Masjed Abubakr Al-Seddiq, Inc., North American Islamic Trust, Inc., Mohammed Bouarfa, Muhyadin Musse, Said Hajiali, and Rashed Ferdous)

Daniel J. Heuel, O'Brien & Wolf, L.L.P. Rochester, Minnesota; and Cindy L. Butler, Stich, Angell, Kreidler, Unke & Scattergood, P.A., Minneapolis, Minnesota (for appellant Tanveer Zubair)

Considered and decided by Smith, Tracy M., Presiding Judge; Worke, Judge; and Smith, John, Judge.*

## UNPUBLISHED OPINION

**SMITH, TRACY M.**, Judge

Appellants Masjed Abubakr Al-Seddiq, Inc. (MAAS), North American Islamic Trust, Inc. (NAIT), Mohammed Bouarfa, Tanveer Zubair, Muhyadin Musse, Said Hajiali, and Rashed Ferdous challenge the district court's denial of MAAS and NAIT's motion for summary judgment, arguing that the Establishment Clause of the United States Constitution and an arbitration clause deprive the district court of jurisdiction over this case.[1]  Because we agree with the district court that (1) it is premature to decide that resolution of this case will necessarily involve improper government entanglement with religion and (2) appellants have waived their arbitration-clause argument, we affirm.

## FACTS[2]

This dispute involves two nonprofit corporations—MAAS and respondent United Islamic Society (UIS)—each claiming to be the rightful beneficiary of properties held in

---

* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

[1] This appeal was filed by all appellants listed above, but the individual appellants did not join in MAAS and NAIT's motion for summary judgment in the district cout.

[2] As further described below, this appeal involves two consolidated cases.  In an effort to resolve one of those cases, the parties submitted stipulated facts, including exhibits, to the district court.  The stipulated facts were later relied upon by the district court in ruling on the summary-judgment motion at issue in this appeal.  The facts here are drawn from the parties' stipulated facts.

trust by NAIT for the benefit of the Rochester Muslim community. MAAS, founded in 1995, is the older of the two organizations and played a key role in the establishment of the Masjed Abubakr Al-Seddiq (the mosque) at the center of this dispute. UIS was established in 2007 and has run the day-to-day affairs of the mosque since 2008. Both nonprofits are located at the same address as the mosque. The properties at issue in this dispute are (1) the Masjed Abubakr Al-Seddiq property located at 17 North Broadway in Rochester (the mosque property), which was conveyed by warranty deed to MAAS in 1996; (2) cemetery plots in Rochester's Oakwood East Cemetery that were purchased by MAAS in 2001 and 2006; and (3) agricultural land outside Rochester that was purchased in 2001 by Rochester Islamic Center (RIC).

In 2007, MAAS and RIC had a dispute regarding the management and financial affairs of the mosque. The organizations turned to Bouarfa, who had been the mosque's first Imam and who had retired as MAAS's president, to broker a solution. Bouarfa called a meeting at the mosque on October 30, 2007. The attendees agreed that the mosque property, agricultural land, and cemetery plots would be conveyed to NAIT as trustee and that a new organization would be formed to manage the mosque. The attendees also agreed that all previous and current board members of MAAS and RIC, including MAAS's treasurer, Zubair, would be ineligible for election to the new organization's board, but that Bouarfa and one other MAAS board member were exempt from this prohibition. It was further agreed that RIC would transfer the agricultural land to MAAS and MAAS would control the mosque bank accounts and all of the properties until the transfer to NAIT was complete, at which point MAAS's board members would resign. The meeting attendees

3

appointed the mosque's new Imam to lead the new organization and gave him authority to select other board members. Twenty individuals signed the meeting minutes describing these agreements.

On the same day as this meeting, NAIT's executive director, Mujeeb Cheema, sent an e-mail to a MAAS board member, responding to a request for information. Cheema described the steps needed to implement a trust, including execution of a declaration of trust, and explained that NAIT would act as the trustee and "the local entity and its community" would be the beneficiary. Cheema also included a description of "NAIT's Waqf Services," which states that mosques "are held by a Waqf (Islamic trust) institution . . . to serve the Islamic objectives prescribed at inception."

In accordance with the October 30, 2007 agreement, RIC conveyed the agricultural land to MAAS on November 1, 2007. The Imam incorporated the new organization, UIS, in December 2007 and held elections for its board. UIS began running the day-to-day affairs of the mosque. MAAS's board then executed a resolution stating that MAAS assets would be given to NAIT as trustee and that the mosque would be leased to UIS. According to the resolution, all MAAS board members resigned except Bouarfa and one additional contact person.

For the better part of the next two years, MAAS held the properties. During this time, Cheema sent various e-mails, in which he requested completion of warranty deeds and trust documents, and inquired whether UIS or MAAS would be the trust beneficiary.

On October 17, 2009, MAAS conveyed the mosque property and the agricultural land to NAIT in separate warranty deeds. Neither deed references the cemetery plots. The

4

warranty deeds state that MAAS transferred the properties to NAIT "[f]or valuable consideration of the desire to follow Islamic princip[le]s of Waqf (Islamic Trust)." Cheema then sent an e-mail asking whether MAAS or UIS should be listed as the trust beneficiary. Cheema explained that, as the grantor, MAAS could designate itself as beneficiary or designate UIS as beneficiary and that, "[i]n addition, your community will remain beneficiary." In a November 2009 e-mail, Cheema stated: "Based on our conversation: The [Masjed Abubakr Al Seddiq] and its community will be the [beneficiary] of the two entrusted properties . . . ."

Little of note happened regarding the trust in 2010 and 2011.

In January 2012, Cheema sent a letter to UIS stating that NAIT holds real estate in trust for the Muslim community and MAAS and that UIS is not a beneficiary of the trust. During January and February 2012, Bouarfa appointed Zubair as the "sole person responsible for all of the affairs" of MAAS and then made Zubair MAAS's vice president with the power to perform the duties of president in the president's absence.

On March 8, 2012, Cheema sent an e-mail to Bouarfa and Zubair, asking for completion of a declaration of trust. On March 12, Zubair and Cheema executed a declaration-of-trust agreement between NAIT and MAAS regarding the mosque property and the agricultural land. The declaration lists NAIT as the trustee and MAAS as both the grantor and the beneficiary of the trust. The declaration recognizes that MAAS conveyed the property to NAIT "IN TRUST (WAQF)," with NAIT holding title to the property "In Trust (Waqf) for the benefit of the Beneficiary and its community." The declaration explains that, "in the Islamic tradition, the title to religious properties, including mosques,

5

Islamic centers, and schools are held by a Waqf (Islamic trust and Islamic endowment[] institutions)," that "a major objective of NAIT is to serve as a Waqf institution," and that the property "is to be declared a Waqf property." The declaration of trust also contains an arbitration clause under which MAAS and NAIT agree to submit disputes regarding appropriate use of the property, successor trustees, and successor beneficiaries to arbitration "by a FIQH Committee of reputable Muslims in the United States."

UIS filed two lawsuits regarding the trust and the properties: (1) a civil action asserting several claims against MAAS, NAIT, and the individual defendants for declaratory, injunctive, and other relief, including damages; and (2) a trust petition requesting determinations regarding the nature and extent of UIS's interest in the trust and removal of NAIT as trustee.

In the hope of resolving the trust-petition action without a trial, the parties submitted stipulated facts and written arguments to the district court. After the matter was submitted, appellants wrote to the district court and suggested that the district court may not have subject-matter jurisdiction over the dispute due to the Establishment Clause of the United States Constitution. UIS objected to appellants' argument.

In its order regarding the trust petition, the district court described the proceeding as "akin to cross-motions for summary judgment" and concluded that it could not make a determination on the merits "without further oral argument or an evidentiary hearing." Regarding UIS's Establishment Clause argument, the district court stated that the dispute may require the court to determine the meaning of "waqf" but that it "is skeptical of the suggestion that it will be impossible to resolve the issues raised in the [p]etition by neutral

6

principles of law and without regard to religious doctrines." The district court also expressed concern, sua sponte, that (1) the purported trust created by MAAS might be an illegal passive trust and (2) the arbitration clause in the declaration of trust might compel the parties to arbitrate their dispute.

UIS's lawsuits were then consolidated, and the district court heard arguments on several motions for summary judgment. In relevant part, the district court denied MAAS and NAIT's motion for summary judgment.[3] Regarding the Establishment Clause issue, the district court determined that "it appears at this stage that the matter can be resolved using ordinary principles of law," but that the district court could "revisit the issue if it becomes apparent, at any time, that resolution will require analysis of the tenets and beliefs of Islam." Regarding the arbitration-clause issue, the district court determined that appellants had waived their argument by not requesting arbitration earlier.

This appeal follows.

## D E C I S I O N

A district court must grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that either party is entitled to a judgment as a matter of law." Minn. R. Civ. P. 56.03. "Generally, an interlocutory appeal may not be taken from a denial of summary judgment, but an issue relating to subject-

---

[3] The district court also denied Zubair's motion for summary judgment, with the exception of the trespass claim against him. The denial of Zubair's motion for summary judgment is not at issue in this appeal.

matter jurisdiction is appealable immediately." *J.M. v. Minn. Dist. Council of the Assemblies of God*, 658 N.W.2d 589, 593 (Minn. App. 2003). We review subject-matter-jurisdiction questions de novo. *Id.* We also review constitutional-interpretation questions de novo. *Pfeil v. St. Matthews Evangelical Lutheran Church*, 877 N.W.2d 528, 536 (Minn. 2016).

**I.**

Appellants argue that the Establishment Clause of the United States Constitution deprives the district court of subject-matter jurisdiction over UIS's lawsuits and that the district court therefore erred by not granting MAAS and NAIT's motion for summary judgment. After appellants filed their principal brief in this appeal, the Minnesota Supreme Court clarified that the "ecclesiastical abstention doctrine," which "has its roots in a line of U.S. Supreme Court decisions regarding church property and church schisms," does not implicate subject-matter jurisdiction and is "not a jurisdictional bar." *Id.* at 532, 534-35. The supreme court declined to decide whether the doctrine should be "viewed as an affirmative defense on the merits or a form of abstention" because the issue was not briefed or necessary to the outcome of the case. *Id.* at 535. Such a determination is similarly unnecessary in this appeal.

Reviewing the jurisprudential history of the ecclesiastical abstention doctrine, the supreme court in *Pfeil* drew several principles from governing United States Supreme Court cases:

> First, a court cannot overturn the decisions of governing ecclesiastical bodies with respect to purely ecclesiastical concerns, such as internal church governance or church

8

discipline. Second, a court may not entertain cases that require the court to resolve doctrinal conflicts or interpret church doctrine. Finally, a court may decide disputes involving religious organizations, but only if the court is able to resolve the matter by relying exclusively on neutral principles of law, the court does not disturb the ruling of a governing ecclesiastical body with respect to issues of doctrine, and the adjudication does not "interfere with an internal church decision that affects the faith and mission of the church itself."

*Id.* at 534 (quoting *Hosanna-Tabor Evangelical Lutheran Church & School v. EEOC*, 132 S. Ct. 694, 707 (2012)) (citations omitted).

The supreme court further explained that it has "traditionally analyzed the ecclesiastical abstention doctrine as an Establishment Clause question and applied the three-pronged test announced in *Lemon v. Kurtzman.*" *Id.* at 536-37 (citing *Lemon*, 403 U.S. 602, 612-13, 91 S. Ct. 2105, 2111 (1971)). Under the *Lemon* test, state action is invalid under the Establishment Clause if it "(1) lacks a secular purpose; (2) has the primary effect of advancing or inhibiting religion; or (3) fosters excessive entanglements with religion." *State v. Wenthe*, 839 N.W.2d 83, 87 (Minn. 2013); *see also Lemon*, 403 U.S. at 612-13, 91 S. Ct. at 2111; *Pfeil*, 877 N.W.2d at 537.[4] As the *Pfeil* court recognized, however, the United States Supreme Court has grounded the ecclesiastical abstention doctrine in not only the Establishment Clause but also in the Free Exercise Clause, evaluating whether adjudicating a claim would interfere with an internal decision that would impact the religious organization's faith or mission. 877 N.W.2d at 537 (discussing

---

[4] The first two prongs of the *Lemon* test—whether state action lacks a secular purpose or has the primary effect of advancing or inhibiting religion—are not at issue in this case.

9

*Hosanna-Tabor*, 132 S. Ct. at 707).  The supreme court in *Pfeil* concluded that the analyses under the excessive-entanglement prong of the *Lemon* test and the Free Exercise Clause "appear to be substantially similar inquiries."  *Id.*  Thus, a court evaluating an ecclesiastical-abstention challenge must determine whether adjudication will foster excessive government entanglement with religion or interfere with an internal church decision affecting the faith and mission of the church.  *Id.*

"Under the entanglement doctrine, a state may not inquire into or review the internal decisionmaking or governance of a religious institution."  *Odenthal v. Minn. Conference of Seventh-Day Adventists*, 649 N.W.2d 426, 435 (Minn. 2002).  "No entanglement problem exists, however, when civil courts use neutral principles of law—rules or standards that have been developed and are applied without particular regard to religious institutions or doctrines—to resolve disputes even though those disputes involve religious institutions or actors."  *Wenthe*, 839 N.W.2d at 90.

Here, there has been no ruling from a governing ecclesiastical body regarding the trust, and there is therefore no governing-body ruling to disturb.  *See Pfeil*, 877 N.W.2d at 534.  What remains for analysis is (1) whether the district court may resolve this case by applying neutral principles of law and (2) whether the adjudication will interfere with an internal church decision affecting the faith and mission of the church.  *See id.*

### Neutral Principles of Law

The state has "'an obvious and legitimate interest in the peaceful resolution of property disputes, and in providing a civil forum where the ownership of church property can be determined conclusively.'"  *Piletich v. Deretich*, 328 N.W.2d 696, 700 (Minn. 1982)

10

(quoting *Jones v. Wolf*, 443 U.S. 595, 602, 99 S. Ct. 3020, 3024 (1979)). When analysis of a property dispute depends upon documents such as deeds, church bylaws, and the church constitution, a dispute can be resolved according to neutral principles of law. *Id.* In such cases, a court may "resolve questions of which of two factions of a local congregation is entitled to possess and enjoy property." *Id.*

The district court relied on *Piletich* to deny MAAS and NAIT's summary-judgment motion. *Piletich* involved "a dispute over the identity of persons entitled to [a church's] real and personal property." *Id.* at 698. A majority of the congregation voted not to recognize a reorganization of the church's diocese and acquired possession and control of the property. *Id.* A minority faction then sued, alleging that it was entitled to the church property. *Id.* The supreme court characterized the action as "a matter of property ownership and membership qualification, to be determined by documents and proceedings of the local church government." *Id.* at 700. According to the supreme court, "state courts may avoid entanglement problems by applying principles of law in a purely secular manner, taking care not to decide disputes on the basis of doctrinal matters, and deferring to decisions of church hierarchy only when church rules or constitutions or state statutes specifically require." *Id.* at 701. Because the issue in *Piletich* was not doctrinal and the church was not hierarchical, the supreme court applied the neutral rule of majority representation to affirm the district court's grant of summary judgment to the majority faction. *Id.* at 699-700, 702-03. "Looking only at the deeds, charter, bylaws and Constitution of the Mother Church, we find that control over church property resides in the majority of the local congregation in this case." *Id.* at 703.

11

The district court determined that, as in *Piletich*, "the dispute here is not doctrinal in nature" and there is no evidence that "the local Muslim community is hierarchical with respect to intra-congregational disputes over local property." The district court therefore determined that, like a dispute between two secular nonprofit corporations, UIS's allegations could be analyzed according to trust law and the rule of majority representation, both neutral principles of law.

Appellants argue that *Piletich* is distinguishable because *Piletich* involved the neutral principle of majority rule and here, appellants assert, UIS does not claim to represent the majority of mosque members. But the district court is correct that under *Piletich* majority rule is a neutral principle of law for resolving a church property dispute; whether that rule will be used to resolve this case goes to the merits and not to the issue of entanglement. Appellants argue, however, that if majority rule is asserted, merely determining the majority faction would require interpretation of religious doctrine. Should UIS pursue a majority-representation claim based on religious doctrine, the district court can address the issue then.

Appellants also argue that *Piletich* is distinguishable because the district court will need to analyze religious doctrine to decide which party is the beneficiary of the trust and whether NAIT should be removed as trustee. Specifically, appellants assert that UIS's claims require the district court to analyze the religious term "waqf" to determine when a trust was created, whether UIS is fulfilling Islamic objectives for the community, and whether NAIT is fulfilling its duties as trustee. UIS counters that its claims can be decided without resolving doctrinal issues, and, to the extent appellants believe that UIS will rely

12

on religious doctrine to support its claims, their concern is premature and can be addressed by the district court if and when that happens.

A determination of whether this case can be resolved using neutral principles of law depends upon a close reading of UIS's civil complaint and trust petition. In its civil complaint, UIS makes no mention of any religious doctrine and does not request relief for religious reasons. UIS instead requests a determination that it is the intended beneficiary of the trust based on the lease, warranty deeds, meeting minutes, and MAAS resolution. In its trust petition, UIS similarly requests a determination that UIS is the trust beneficiary and removal of NAIT as trustee "for cause."

But UIS's trust petition also includes an allegation that "the properties were transferred to NAIT to be held in 'waqf,' which is an Arabic word meaning endowment typically of a building or plot of land for religious or charitable purposes." The petition also alleges that NAIT "has attempted to interfere with the religious services at the mosque." Finally, in its memorandum in support of its trust petition, UIS cites the language in the warranty deeds regarding "waqf" as evidence that the parties intended a trust relationship and that NAIT had an enforceable duty as trustee to hold the properties in accordance with Islamic law.[5]

More concerning, UIS argued in its memorandum that "waqf" requires the properties to be held in trust with a charitable purpose of teaching the Islamic religion, and

---

[5] In context, this latter argument in UIS's memorandum appears intended to refute the district court's concern that the transaction created a passive trust, rather than intended to request relief based on a religious doctrine.

13

that UIS "is the organization that advances this charitable purpose." Contrary to the assertion otherwise in its brief, UIS specifically argued that "[t]he phrase 'Waqf (Islamic Trust)' and the surrounding circumstances are sufficient to designate the community and its representative as the beneficiary of the trust." Appellants point to this section of UIS's argument as evidence that the district court will have to determine the meaning of "waqf" to resolve the parties' dispute.

We disagree with appellants that determining which party is the trust beneficiary necessarily requires resolution of a dispute over the meaning of a religious term or a determination of which party fulfills the trust's purpose to serve Islamic objectives. If the district court declares the declaration of trust valid, there appears to be no reason to interpret or analyze "waqf." Similarly, if the district court declares the declaration of trust invalid, as UIS requests, a beneficiary determination likely depends on testimony and the documents in the record regarding the parties' intent, which may include, among others, the warranty deeds that reference "Waqf (Islamic trust)." Although the warranty deeds reference "waqf," they do not name a beneficiary or suggest that the beneficiary must comply with any "waqf" requirements. The limited information in the record about "waqf" simply does not suggest that a doctrinal analysis of "waqf" will be necessary to or dispositive of a beneficiary determination.

Likewise, it does not appear that the district court must analyze religious doctrine to determine whether UIS can sustain a claim against NAIT as trustee. Appellants argue that the district court will have to interpret "waqf" to determine whether NAIT has fulfilled its duties as trustee. We are not convinced. A trustee's secular duties can be evaluated

14

under neutral principles of law without resulting in excessive entanglement, *cf. Jones*, 443 U.S. at 604, 99 S. Ct. at 3026 (observing that a court must evaluate religious documents establishing a trust in secular terms), and it does not appear at this point that UIS is basing its claims on alleged violation of religious duties. To the extent appellants argue that the use of the term "waqf" in the warranty deeds did not establish NAIT as the trustee in 2009, we are not persuaded that doctrinal analysis of the term is necessary to determining when the trust was created.

The district court determined that it could likely resolve this dispute by relying on neutral principles of law. Based on the majority of UIS's allegations, resolution of the dispute likely requires analysis of (1) the October 30, 2007 meeting minutes; (2) subsequent documents such as MAAS's resolution regarding the meeting's agreement; (3) the warranty deeds conveying the properties to NAIT; (4) correspondence regarding which party was intended to be the beneficiary of the trust; (5) the 2012 declaration of trust; and (6) any relevant testimony. We agree with the district court that determining when a trust was created and which party was intended to be the trust beneficiary likely involves neutral principles of law rather than religious doctrine.

As noted above, however, several of UIS's assertions raise a concern that UIS could later rely on evidence regarding religious doctrine to support its petition and civil action. If UIS does so and the dispute can no longer be resolved under neutral principles of law, the district court will need to respond accordingly. But because UIS asserts that its allegations can be analyzed using neutral principles of law and that it does not intend to introduce evidence regarding religious doctrine, and because the bulk of UIS's allegations

15

rely upon secular documents, we cannot at this time hold that UIS's arguments definitely implicate religious doctrine.[6]

### *Interference with an Internal Church Decision*

We similarly cannot hold at this time that a court resolution of this matter would necessarily interfere with an internal church decision that affects the faith and mission of the church. *See Pfeil*, 877 N.W.2d at 534.

Appellants argue that UIS's assertions regarding Zubair involve matters of church discipline, which the district court cannot properly consider. *See id.* at 541 (holding that analyzing statements made during a church disciplinary proceeding would improperly interfere with a church decision regarding faith or mission). But we disagree that UIS's allegations regarding Zubair and the alleged removal of Zubair from MAAS's board are similar to the allegations and church disciplinary proceeding at issue in *Pfeil*. Unlike in *Pfeil*, a resolution in this case does not require an intrusion into a church decision to discipline Zubair. *See id.*

Appellants also argue in their reply brief that, to resolve the parties' dispute, the district court will have to decide whether the Imam has violated Islamic doctrine by how he chooses to teach Islam to the community and by his decision not to remain neutral in this dispute. We disagree. Nothing in UIS's civil action or trust petition suggests that UIS requests relief based on the Imam's actions. The Imam's teachings currently appear

---

[6] Appellants note that they also raised doctrinal issues in defense of UIS's complaint, but they do not elaborate on how the issues they raised require reversal of the district court's ruling.

irrelevant to UIS's claims. In addition, we see no reason at this stage that the district court would have to decide whether the Imam violated Islamic doctrine by not remaining neutral.

Finally, appellants argue that, by recognizing the potential of an entanglement issue and by allowing future analysis of this issue, the district court has already become excessively entangled with religion. In *Pfeil*, the appellants sought relief for several allegedly defamatory statements made in a church disciplinary meeting. *Id.* at 531. In deciding the tort claims were barred, the supreme court rejected the appellants' proposed "statement-by-statement analysis" because, it held, simply determining whether a statement is "secular" or "religious" in that context would require interpretation of religious doctrine. *Id.* at 538. "[T]his sort of complicated and messy inquiry" itself creates excessive entanglement with religion. *Id.* at 538-39. Here, in contrast, it does not appear that resolution of UIS's claims in its trust petition and complaint will necessarily require interpretation of religious doctrine or that religious doctrine must be interpreted simply to make that determination. The district court recognized that its ability to resolve UIS's claims will change if it becomes apparent that resolution requires analysis of the tenets and beliefs of Islam. That recognition does not run afoul of *Pfeil*.

We conclude that it is premature to hold that UIS's allegations cannot be resolved under neutral principles of law or that a resolution would improperly interfere with a church decision. We therefore affirm the district court's denial of MAAS and NAIT's summary-judgment motion on this point.

17

**II.**

Appellants also argue that the arbitration clause in the declaration of trust deprives the district court of subject-matter jurisdiction over UIS's lawsuit and that the district court therefore erred by not granting MAAS and NAIT's motion for summary judgment. The district court determined that appellants had waived their arbitration defense.

As appellants assert, a challenge to the court's subject-matter jurisdiction "can be raised at any time and cannot be waived by the parties." *Nelson v. Schlener*, 859 N.W.2d 288, 291 (Minn. 2015). But arbitration is an affirmative defense, and failure to invoke arbitration in an answer results in a waiver of the defense. *W. St. Paul Fed'n of Teachers v. Indep. Sch. Dist. No. 197*, 713 N.W.2d 366, 377 (Minn. App. 2006); *see* Minn. R. Civ. P. 8.03 (requiring parties to set forth affirmative defenses, including arbitration, in their answers). "Waiver of a contractual right to arbitration is ordinarily a question of fact and determination of this question, if supported by substantial evidence, is binding on an appellate court." *Fedie v. Mid-Century Ins. Co.*, 631 N.W.2d 815, 819 (Minn. App. 2001) (quotation omitted), *review denied* (Minn. Oct. 16, 2001). Findings of fact are not set aside unless clearly erroneous. *Id.*

Appellants argue that the district court erred by not specifically finding that appellants intentionally relinquished a known right. *See id.* (explaining that waiver requires "intent to relinquish a known right"). But the district court discussed appellants' decisions to (1) not raise the arbitration clause in either their response to the trust petition or their answer in the civil case, (2) not move to amend either answer, and (3) litigate the matter for over two years before invoking the provision. Through this discussion, the

18

district court implicitly found that appellants relinquished a known right. *See Bros. Jurewicz, Inc. v. Atari, Inc.*, 296 N.W.2d 422, 428-29 (Minn. 1980) (affirming the district court's conclusion that the appellant waived its right to compel arbitration by filing an answer and litigating the case in district court for one year before invoking the arbitration provision). This implicit finding was not clearly erroneous, particularly because the arbitration clause is located in the declaration of trust, a document that appellants relied on in both lawsuits.

Appellants also argue that the caselaw regarding waiver of an arbitration provision is distinguishable because appellants do not seek to compel arbitration but to defeat the district court's subject-matter jurisdiction. But appellants cite no caselaw to support this distinction. And, on the contrary, we have stated that "[a] contractual agreement to arbitrate disputes does not strip the district court of its subject matter jurisdiction to resolve the dispute" when the right to arbitration has been waived. *Koes v. Advanced Design, Inc.*, 636 N.W.2d 352, 362 (Minn. App. 2001), *review denied* (Minn. Feb. 19, 2002).

Appellants argue, though, that the arbitration issue is "particularly important in this case" because the declaration of trust identifies a "hierarchical tribunal" that could resolve the property dispute, and the Establishment Clause dictates that a court give deference to a hierarchal tribunal. Had appellants timely sought to submit UIS's claims to an arbitration tribunal at the start of this dispute, their deference argument might be more compelling. But, as the district court determined, appellants waived their arbitration defense, and appellants cite no caselaw for the proposition that holding them to that waiver would

19

violate the Establishment Clause. The arbitration provision appears not in a church document but in a secular agreement, and appellants waived it.

Because appellants did not invoke the arbitration clause in the declaration of trust until MAAS and NAIT's summary-judgment motion, which was filed more than two years after the start of UIS's civil action and after extensive litigation in both cases, we conclude that the district court's finding that appellants waived their right to invoke the arbitration clause is not clearly erroneous. We therefore affirm the district court's denial of MAAS and NAIT's motion for summary judgment.

**Affirmed.**